DINWIDDIE *v.* STATE.

4202                                      151 S. W. 2d 93

Opinion delivered May 26, 1941.

*Joseph Brooks* and *Jno. A. Hibbler,* for appellant.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, C. J. S. R. Davis was nightwatchman for Critz Chevrolet Company, North Little Rock. Parts of the property under Davis' observation were two lots used for displaying second-hand cars.

During the night of September 4-5, 1940, Davis was killed. Dr. H. A. Dishongh, coroner, who examined the corpse about seven o'clock in the morning, September 5, thought death had occurred several hours earlier. The skull had been penetrated in two places. The holes were separated by a narrow strip of the bone structure. Indications were that the wounds had been made with a blunt instrument—"a sledge hammer, or a bigger object than a.pistol." The body was found near the middle of one of the lots. There were cars on either side. To the south was a galvanized iron building used as a garage. A chair was nearby. The watchman's pistol was on the ground near the body. An officer testified the weapon contained two discharged shells; that Davis was lying on his right side with his head to the west. One arm was extended. The pistol was within approximately a foot of the dead man's hand.

H. A. McClain, filling station operator, was on his way home shortly after eleven o'clock (September 4). He passed the Chevrolet property and saw a white man (presumably Davis) sitting in a chair near the corner of the

main brick building. A Negro woman[1] was talking with him. The chair was on the outside of the building, in the street. Through curiosity witness drove his car around the block—between the building and the used car lot. The woman, whose position had changed, stopped to let the car go by. As witness went by, the watchman flashed his light "down the side going between the cars." When witness passed the Negress she ran back of his car "up in the used car lot."

At 11:18 or 11:20 officer Jack Morgan saw the defendant going east. He knew her personally and asked where she was going. Appellant replied that she was on her way home.

S. A. Moss, Critz service manager, testified that the office was usually closed at six o'clock. Davis ordinarily came to work at six. Late in the afternoon four tires were sold for $50, a single bill having been received in payment. It was turned over to Davis to be kept until the following day. Davis put the bill in his purse. This occurred between six and seven o'clock.[2]

Joe Loebner, witness for the state, lived about 200 feet from the used car lot. Between 11:30 and 12:00 o'clock, September 4, he heard two shots, but did not know the direction whence the sounds came. On cross-examination the witness testified that the explosions could have been backfires from an automobile, but he did not think they were. The sounds were "right together."

Chester Dinwiddie, appellant's brother, testified he was living in North Little Rock upstairs over "Popeye's" place during September, 1940. At midnight appellant came to the house occupied by witness. His wife, Pearline, opened the door. Appellant threw some money on the bed and asked that it be counted. It consisted of a fifty dollar bill, three fives, one ten, eleven ones, and seventy-five cents in silver, a total of $86.75. Appellant told witness the baby of Esau Dinwiddie (another brother) was sick, and that witness had been sent for.

---

[1] McClain did not, at the time of the transaction, know who the woman was. She was dressed in white. At trial he identified her as Mary Dinwiddie.

[2] The purse was elsewhere referred to as a billfold.

With his wife and appellant, witness walked to a point near the Ben McGehee Hotel and there engaged a taxicab. The parties were taken to Esau's home near the Lincoln avenue viaduct. The baby was not sick. Witness asked appellant if she intended to return with them, and she replied "no." Appellant was wearing a white dress. It was torn and revealed a spot of blood. In commenting on the dress the witness said: "It was so torn up I don't know whether [the blood] was in the back or front." Appellant took off the dress, threw it on the floor, and asked witness to put it in the charcoal burner. He refused to do so. There was no fire in the stove, and appellant did not explain why she wanted the dress disposed of. She borrowed a dress from witness' wife. The torn garment was retained and turned over to the officers. Another brother, Elijah Dinwiddie, and his wife, were also present at Esau's home. Appellant did not act nervously, nor did she disclose the source of the money, or that Davis had been killed.

George Looney testified he was staying with Esau Dinwiddie, and that appellant came to the house "pretty late." Looney was asleep when she came. Appellant spent the night there. The following day appellant, with Esau Dinwiddie and other members of the family, went to Augusta. The witness (Looney) drove them in his car. He borrowed $15 from appellant for use in making a payment on his car. When the party arrived in Augusta appellant had a fifty dollar bill.

Anthony Seats, one of appellant's uncles, lived at Augusta. Appellant, with Esau and others, visited him. It was after four o'clock in the afternoon. Esau and witness attempted to get a man named Nickerson to change the fifty dollar bill. He declined, but Blackwood, next door, sold them five gallons of gasoline and took the bill, making the necessary change. The bill was slightly stained or discolored with what appeared to be blood. It was introduced as an exhibit.

Officer J. H. Anderson, of North Little Rock, received the bill from the Conner Motor Company (Ford dealer) of Augusta. The company also operated a service station.

On being recalled, Anderson testified he telephoned from Augusta, directing that the Dinwiddies be detained. When he returned appellant had confessed. Twenty dollars of the money taken from Davis had been recovered, other than the fifty dollar bill.

The confession, Anderson testified, was voluntary. It was made orally in the city hall in North Little Rock. Chester Dinwiddie was present. He urged appellant to tell the truth. The assistant prosecuting attorney informed the court that appellant "later made a statement to me about it, and that was taken down." Officers Charles, Campbell, Blankenship and Morgan, participated in the arrests.

In her confession appellant implicated George Looney. Anderson testified they took appellant and endeavored, with her help, to locate and identify Looney, whom appellant had described as an ex-convict. They went to state police headquarters "to see if they had a picture and record there." Anderson was not present at state police headquarters when appellant was again questioned, and when she is alleged to have made a second confession.

According to Anderson, appellant directed the officers to a water tank near the Missouri Pacific bridge, "where supposedly they could find the iron she hit Davis with."

At trial, testimony relating to the alleged confession was taken in chambers. Officer Charles testified he arrested appellant just before noon. That evening appellant was driven to state police headquarters and questioned in a room used by the officers. She was not taken into the room where there were face masks and machine guns. No attempt was made to question appellant at that time— "there was no occasion to do so, because she had already admitted the crime." The officers were looking for George Looney's picture.

Appellant testified that after her arrest she was taken to state police headquarters. This occurred about one o'clock Friday afternoon. She denied having made a confession in North Little Rock, and insisted that the

officers began hitting her. At state police headquarters she was carried through a room "where there were a lot of men sitting at a desk." There were face masks on the wall. Pistols were in evidence. There was a machine gun "in a glass cage, and there were clubs and straps, and a lot of pictures."

Appellant contended she was made to sit in front of a table—"then they got wooden clubs and straps and a rubber [hose] and laid them on the table." The machine gun was also procured and placed on the table before appellant. "Then a man with a strap across his shoulder got a leather thing and put it around my neck till I could hardly breathe. They caught me by the hair and beat me in the face until I felt like fire on the inside of my face. Then he stood me up till he gave out, and I said, 'no, I will tell the truth.' Then he pushed me to Mr. Charles and he turned the chair down and beat me till he had the strap torn all to pieces."

Appellant insisted she was threatened with the machine gun, and kept at state police headquarters "until almost day," and "I had to say something to keep from dying. They had carried me back to North Little Rock and hit me two or three times. This man [pointing to one of the officers whose name does not appear in the record] asked me if I would sign a piece of paper or something. I signed it Saturday morning in the North Little Rock police station."

In describing further the circumstances attending the transaction, appellant said: "I was sitting in the room by myself and he came back. I said, 'Don't beat me, don't beat me and make me say I did it; please don't.' He said, 'You are going to say you did it,' and I said it and signed the paper."

Officer John Charles denied appellant was coerced or mistreated. The accused, he said, volunteered the information that she had killed Davis, and that the iron used by her was concealed near a rain barrel under the Missouri Pacific bridge. After taking appellant to state police headquarters the officers were back in North Little Rock by ten o'clock, and witness (Charles) was in bed by

eleven. "We didn't stay at state police headquarters more than twenty minutes."

In response to a question by the court, Deputy Prosecuting Attorney Bogard said: "Your Honor, when this girl made her statement she more or less made it to her own brother. . . . I told her brother this: 'It will be better for you—she has implicated you—because even if you didn't have anything to do with the killing, the money was traced to you'."

Bogard testified that after the verbal confession was made he took two stenographers for the purpose of having it repeated and transcribed. At trial one of the ste-·nographers, who had transcribed part of appellant's statement, was ill. The court ruled that the written statement was inadmissible because of the stenographer's absence, but permitted Deputy Bogard to examine appellant in respect of the so-called confession. The court also held that a purported confession made at the county jail was admissible. Appellant admitted she was not mistreated while in jail.

When trial was resumed in the presence of the jury, Officer Anderson testified that appellant's confession was substantially as follows:

She was passing the Critz lot about 11:30. Davis, seated in a chair in front of the main building, engaged her in conversation. They immediately went to the used car lot, where appellant got possession of Davis' billfold and made an effort to get away. Her escape was prevented by a wire fence at the back of the lot. Davis, in the meantime, had discovered his loss and began calling to her. Seeing she could not get away in the manner intended, she returned to Davis. Davis fired two shots at her. Half way between the rear of the lot (wire fence) and Davis she passed a pick-up truck. From it she procured a tire tool. When Davis grabbed her and undertook to recover the money, she struck him two or three times with the iron. The tire tool was found near the Critz work shop. [It contained blood stains.] Appellant, finding that her dress was bloody, tore off part of it.

Appellant testified that she and Davis had been "going together" for eight or nine years. She had frequent "dates" with him. The morning of September 4 Davis came to her home—"We were sitting there laughing and talking and kissing, and he said, 'Do you want anything?' and I said, 'Yes, I want some groceries and clothes for winter, and I have to pay the rent.' He said, 'Come to the office at 10:30 or 11:00 o'clock tonight,' and I said, 'All right'."

About half past ten o'clock she went to the car lot. Davis was sitting on the corner in a chair. "He caught hold of my hand and we walked across the street to the lot. He turned loose and I walked into the house and to the cot and laid my head back. . . . We played around for the longest time.. . . . He gave me some money—took it from his billfold without counting it. I had the money (it was folded) in my hand. . . . In about thirty minutes a low, chunky man with bushy hair entered. I was lying on the cot and didn't see the man until he spoke. I was lying flat on my back and Mr. Davis was across me with his head on my shoulder. The man said, 'This is what I have been suspicioning for a long time.' He said, 'When I get through with you, you will all make a pretty coffin for the police and public to find.' Mr. Davis jumped up and said, 'You will never remember telling the police or anybody else what you have seen or heard.' . . . Mr. Davis raised his pistol and this man hit him and knocked him back on me. They fought near the door. Mr. Davis said, 'I don't want the police or anybody else to know or come here and see you.' As I was going for the door trying to get by this man I got hit on the shoulder, and left after I got free. When I got under the light I saw there was blood on my dress, and I went to my brother's house."

## Other Facts—and Opinion

The court did not err in permitting appellant to be cross-examined in respect of the purported confessions; nor was there error in the manner statements were presented, or in the instructions relating thereto.

Instruction No. 18, in part, is: "There has been some testimony regarding a confession, and evidence presented to the court and jury on that question. Before you can consider any confession as evidence you must find (a) that the defendant did make a confession, (b) that the confession she made was the one you heard from the witness stand, (c) that the defendant told the truth, and (d) that the confession was voluntarily made." [See *Thomas v. State,* 125 Ark. 267, 188 S. W. 805; *Dewein* v. *State,* 114 Ark. 472, 170 S. W. 582; *Hendrix* v. *State,* 200 Ark. 973, 141 S. W. 2d 852; *Morris* v. *State,* 197 Ark. 695, 123 S. W. 2d 513.]

The jury returned a verdict of murder in the first degree and the court adjudged that the defendant should suffer death by electrocution.

Counsel do not seriously contend that Davis was not killed by appellant. In the brief it is said: "The murder was committed (if committed by this appellant) after the commission of larceny, and in her attempt to escape from the lot." *Rayburn* v. *State,* 69 Ark. 177, 63 S. W. 356, is cited as being in point. In an opinion handed down March 25, 1901, a majority of the court held it to be unnecessary to charge specifically in the indictment that the murder was committed in an attempt to perpetrate robbery. Chief Justice BUNN dissented. On rehearing, June 1, 1901, the judgment was reversed because the court gave an instruction that the defendant was guilty of murder in the first degree if the jury found from the evidence beyond a reasonable doubt that the decedent was killed by the defendant while the latter was attempting to perpetrate a robbery. The indictment did not allege an attempt to rob.

The case is not applicable here because the information charged that Mary Dinwiddie killed S. R. Davis "unlawfully, feloniously and willfully, and with malice aforethought, and after deliberation and premeditation, and with a felonious intent then and there to rob."

While there is no direct evidence, aside from the confession, that Davis was robbed (appellant having contended the money traced to her was a gift from Davis), we think her failure to report the alleged assault by the

unknown man, her flight, and the circumstances attending disposition of the money, were sufficient to go to the jury.

There was testimony, not set out in this opinion, that Davis' relations with appellant were founded upon physical lust, and that sex propensities prompted the invitation that appellant meet him late at night where obscurity and convenience would contribute to the consummation of desire.[3]

It is our opinion that the evidence does not show that appellant went to the Critz place for the purpose of committing robbery or murder, or that premeditation and malice actuated the crime. That she did kill Davis seems certain, but if, as the undisputed evidence shows, the meeting was planned for the purpose of engaging in immoral physical conduct, and the robbery and homicide were incidental and without premeditation, the verdict of first degree murder is not sustained.

The judgment, therefore, will be modified by substituting 21 years of penal servitude; and, as modified, it is affirmed.

---

[3] Davis has been divorced by his wife four or five years.