McCLELLAN *v.* STATE.

4236

156 S. W. 2d 800

Opinion delivered December 15, 1941.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

MEHAFFY, J. The appellant was tried and convicted of grand larency, and his punishment was fixed by the

jury at one year in the penitentiary. To reverse this judgment, this appeal is prosecuted. The appellant has filed no brief.

Herschel Russell testified in substance that he had lived at Iuka, Izard county, for twelve or thirteen years; in 1938, he owned a few cattle; that one of the steers was taken the latter part of July or the first of August; witness lives about a quarter of a mile from the line between Izard and Baxter counties.

Virgil Killian testified in substance that he was acquainted with appellant; that in 1938, he owned some cattle; that one heifer was stolen; it was taken to West Plains by Albert Pickens and appellant; witness went with a man to appellant's house to investigate; as they approached the house appellant was on the porch, but before they got there appellant went through the house and was gone 30 or 40 minutes.

A. E. Adamson testified in substance that he lived at West Plains, Missouri, and had been a post office inspector for several years; he was inspector during 1938 and 1939 and made some investigation relative to the use of the mails; he saw appellant in 1939 at the post office at Jordan. Witness here introduced the following statement by appellant and said there was no promise of reward or threats used:

"I am 24 years of age and married, having two children. I reside near Jordan, Arkansas, where I receive my mail. I am engaged in farming.

"On or about June 11, 1938, I accompanied Albert Pickens to Batesville, Arkansas, leaving the vicinity of Jordan about 1:00 a. m., with a load of six head of cattle in Pickens' truck. Pickens informed me the cattle had been stolen. We took the cattle to Batesville, where Pickens shipped them by rail to Stewart-Carson White & Co., National Stock Yards, Illinois, in the name of Fred Snyder. Snyder is a patron of a star route on which Pickens was employed as carrier at that time. Snyder received his mail through the post office at Norfork, Arkansas. After we left Batesville, I asked Pickens why he had shipped the cattle in Snyder's name and he stated

that when the check came to Norfork he would get it from the mails.

"On or about June 15, 1938, I accompanied Pickens to Gainsville, Missouri, for the purpose of cashing the check which had been sent to Snyder in payment for the cattle. We left Jordan about 7:30 or 8:00 o'clock a. m. Pickens showed me the check on the evening of June 14th, 1938. I did not see it again until the next day on the road to Gainsville. Pickens gave me the check to get it cashed. I cashed the check at the bank of Gainsville, Gainsville, Missouri. I indorsed the check in the name of Fred Snyder. The check was dated June 13, 1938, and payable to Fred Snyder in the amount of $129.79. I received the amount of $30 from the proceeds of the check. After I had cashed the check, I gave all the money to Pickens and he gave me $30. Nick Rand was also to receive a split from the money as he had put up the cattle Pickens had hauled off. The cattle had been running on free range.

"On or about August 6, 1938, on Saturday, I accompanied Albert Pickens to West Plains, Missouri, leaving from the vicinity of Jordan about 3:00 a. m., with three head of cattle in Pickens' truck. Owen Rand went with us as far as Mountain Home, Arkansas. We sold these cattle to a man named Clark at West Plains, receiving the sum of $56, of which amount I received the amount of $12. I helped Pickens to sell this load of cattle. We sold them in the name of W. M. Hickman and Clark gave me a check payable to W. M. Hickman. I indorsed the name of W. M. Hickman on this check and cashed it at a wholesale house at West Plains, Missouri.

"(signed) Edwin McClellan.

"The use of the mails was not involved in the second sale of stolen cattle by me and Pickens. I was brought into these transactions by Pickens and at his request. I had nothing to do with the theft of the cattle, but I did help dispose of them, knowing them to be stolen. I have not been involved in any other disposals of stolen cattle. I have been shown the check which I cashed payable to Fred Snyder and have placed my name on it as identification.

"(signed) Edwin McClellan.

"Subscribed and sworn to before me at Jordan, Arkansas, this September 23, 1939.

"A. E. Adamson, Post Office Inspector."

Witness Adamson said that appellant read the statement before he signed it, and knew what was in it; appellant indicated to witness that he was going to tell the prosecuting attorney what was in it; he repeated that no promises or threats were made; witness learned that a check had been mailed by a commission company to Fred Snyder and appellant told him all about it; does not know whether appellant had talked to the prosecuting attorney or not; the events in the other case indicated appellant testified for the state and he was not prosecuted.

The prosecuting attorney, R. H. Wood, testified in substance that appellant made a statement to him in the presence of appellant's brother, Ben McClellan, in October, 1939, relative to property taken from Virgil Killian and Herschel Russell; appellant did not come to see witness, as he had promised he would, for two or three weeks, so witness went to see appellant; appellant told him all about the Killian and Russell matter.

There was then introduced the following statement, made by appellant:

"I, Edwin McClellan of Jordan, Arkansas, do make the following statement of my own free will and accord without threat or promise, but solely that my conscience may be clear.

"On Friday, August 5th, 1938, I went from my home to the Jordan post office. On my way down I ran across Owen Rand and Nick Rand about the Otter Creek bridge. They had three cattle tied up in the woods, one a brindle steer, one a Jersey heifer and one a white faced heifer, which they said they had rounded up, and were stolen cattle. After a short time Albert Pickens came down the road from Jordan in his truck and stopped. Owen told Albert that he had some stolen cattle, and Albert said his truck would fool them. Albert said there was one thing worrying him and that was his name on the truck, and he got out and dipped a rag in the battery water and tried

to rub the name off, then Owen put the cloth in the sand and rubbed the name off. Albert then drove away and I went on to Jordan. Later I saw Albert at Jordan and he asked me to go to West Plains with him, and said that I could get my shorts. Sometime around midnight or after that night I met Albert Pickens and Owen Rand in Pickens' truck at the Lawson mailbox on the Jordan road, I got in, and we went to Mountain Home. Pickens slowed the truck down about the picnic grounds and Owen jumped off. We went on to West Plains, getting there about sun-up. I got off up in town and Pickens went on down and unloaded the cattle. Then he came back up town and asked me to go with him, and I went down to the stockyards with him. Roy Clark drove up, and Pickens stepped back, and Clark offered $56 for the three head of cattle, they being the same cattle that Owen and Nick had tied up the afternoon before. I told Clark that they were stolen cattle, that the other boys had stolen. Clark gave us a check for $56 made out to W. M. Hickman drawn on the First National Bank of West Plains. We went down to the West Plains Wholesale Grocery Co., where Pickens bought some feed. When we started to pay for it I pitched the check out on the counter and Pickens said for me to sign his name to it. I signed W. M. Hickman. They tried to hold the check for an account Bill Hicks owed them, but Pickens talked them out of it. Pickens had told me that if they asked where we were from to tell the man that we were from Big Flat, but I misunderstood them and when they asked me, I said Ash Flat. We then went down to the Farmers Exchange and I bought some feed. Then we came back home by the way of Mountain Home. Pickens let me out at the Iuka and Norfork road, handed me $12.

"In witness whereof, I have hereunto set my hand this the 19th day of October, 1939.

"(signed) Edwin McClellan.

"Subscribed and sworn to before me this 19th day of October, 1939.

"R. H. Wood."

Witness Wood said that no promises were made to appellant; appellant asked him to recommend a suspended sentence, but witness told him he would not do it; that he had dismissed two cases against appellant and that any punishment in this case would have to be left to the court; appellant then asked witness if he would be barred from pleading insanity, and witness told him he would not.

Ben McClellan, a brother of appellant, testified in substance that the paper signed by appellant in the prosecuting attorney's office was witnessed by him; that it was signed after the prosecuting attorney made two or three promises; witness was of the opinion that appellant would be taken care of if he made this statement; appellant would not have made the confession if he had not been led to believe that he would be taken care of; the prosecuting attorney tried to get them to plead guilty and let him recommend a suspended sentence, but they refused; appellant came in to make the confession because he was under the impression that the prosecuting attorney was to take care of him; talked to the prosecuting attorney about pleading insanity.

John Ashley, an attorney who was employed to represent appellant, testified in substance that appellant kept contending he was innocent, but finally asked witness what would happen if he told about it; witness promised to see the prosecuting attorney. (At this point the court stated that he would take judicial knowledge that a case could not be made against Pickens without appellant's evidence.) Witness gave the prosecuting attorney information as to where the cattle were sold because he had promised to take care of appellant.

Appellant testified in substance that the reason he agreed to make the confession was because the prosecuting attorney agreed to take care of him; he did not want to tell the prosecuting attorney until he promised him that he would take care of him and see that he was not hurt; he told witness if he would make a clean breast of it he would not be hurt; that was before any confession was made; it was witness' understanding that if

he testified for the state and made a clean breast he would never be hurt.

The court thereupon ruled that he would admit the confessions and let the jury pass upon the question of whether they were voluntarily made.

A. E. Adamson testified that appellant had made certain statements to him which he reduced to writing and appellant signed it; that no threats or promises were used.

The court held that a portion of the statement was incompetent, but appellant's attorney objected because only a part of the statement was to be admitted. The court thereupon admitted the whole of the statement. At this point, the check which was allegedly signed by appellant and several specimens of his handwriting were introduced.

R. H. Wood, the prosecuting attorney, was recalled and testified at length about the statements made to him by appellant.

Jim Southard, Tom Hively, M. L. Woodcock, and Dan King all testified that appellant's reputation was good prior to the cattle stealing.

Appellant testified in substance that he was 26 years old, had a wife and two children and was farming; that he did not steal the cow and steer; he helped Pickens sell a load of cattle for $56 and appellant received $12; they sold them in the name of W. M. Hickman and appellant indorsed the check. He then testified about his statement before the prosecuting attorney and their conversation; that he knew the cattle were stolen and he is the one who actually sold them and accepted the check; that he was indicted in March, 1939, on two different charges and made a witness for the state in these cases, but did not tell about the present case because he was not asked.

Appellant moved for a directed verdict. The court then instructed the jury, and after hearing the argument and instructions of the court, they returned a verdict finding the appellant guilty and fixing his punishment at one year in the state penitentiary.

Appellant having filed no brief, we know what his objections are only by the record and the brief filed by the prosecuting attorney. The appellant objected to the introduction of two confessions, one made to the prosecuting attorney and the other made to Adamson, a post-office inspector, and claimed that he was promised immunity and promised that he would not be hurt.

The record shows that at that time the appellant was indicted, as were also others charged with stealing cattle, and this trial was in June. The appellant made his confession and the prosecuting attorney agreed with him that if he would testify for the state he would dismiss the charges against him. Appellant did this and the charges against him were dismissed. At that time the prosecuting attorney had never heard of the case now at bar. The promises that appellant claims the prosecuting attorney made were made prior to the trial of those cases in June, his confession being made sometime before said trial; and it was not until the following September that the prosecuting attorney heard of the present charge. Appellant admits that this charge was not discussed, and that he did not tell the prosecuting attorney about it.

Moreover, appellant took the stand in the trial of this case and testified that the confessions made to Adamson and the prosecuting attorney were true, but added that the prosecuting attorney had promised to take care of him; so that everything in the confessions that were introduced against him were testified to by appellant himself, and he expressly stated that they were true.

This court said in the case of *Brown* v. *State*, 198 Ark. 920, 132 S. W. 2d 15: "In many instances, where the accused is confronted with a confession which he cannot deny having made, he insists that it was not freely and voluntarily made. But that insistence does not render the confession inadmissible, where there is testimony to the effect that it was in fact, freely and voluntarily made. In such cases the practice approved by us, which was followed in the instant case, is for the

court to hear the testimony in the absence of the jury as to the circumstances under which the confession was given, and if there is a substantial question as to whether it was freely and voluntarily made, to submit that question of fact to the jury, after admonishing the jury to disregard the confession unless it was found to have been voluntarily made.''

. The court strictly followed the above rule in the trial of the present case, and practically all the testimony shows that there were no promises made with reference to this particular case by the prosecuting attorney or anyone else. The trial judge did not pass on the question as to whether the confessions were voluntarily made. He passed on the question of their admissibility alone, and submitted to the jury the question of whether they were voluntarily made.

The appellant admits that in their conversations, nothing was said about this particular case and he did not mention it to the prosecuting attorney.

This court has many times held that confessions, to be admissible in evidence, must be made without hope of reward or fear of punishment, and it must be shown that the confession was voluntarily made. *Charles* v. *State,* 198 Ark. 1154, 133 S. W. 2d 26; *Morrison* v. *State,* 191 Ark. 720, 87 S. W. 2d 50; *Davis* v. *State,* 182 Ark. 123, 30 S. W. 2d 830.

Not only does the great weight of the testimony show that the confessions were voluntarily made, but the record also shows that the appellant testified in the instant case that they were true.. The evidence is sufficient to justify the jury in its finding appellant guilty.

Appellant objected to instruction No. 4, given by the state, which reads as follows: ''Gentlemen, in this case as the testimony and evidence has developed a great deal of testimony has been introduced that is not material at this time in this case. You are instructed to disregard any testimony with regard to any promise or motive that may have prompted the defendant to sign the confession in issue for the reason that he has gone on the stand himself and admitted that the statements made

therein that might be considered as material and true, and you are to disregard, therefore, anything that goes to the question of promises or motive in his making the confessions.''

Appellant testified that he knew the cattle were stolen when he found them hidden out in the brush. He, with Pickens, took the cattle and hauled them to market. He, himself, sold the cattle and accepted the check. The check was made to W. M. Hickman, whose name appellant used in indorsing the check. When he cashed the check he received $12 of the money.

Appellant also objected to the court's refusal to give his instructions Nos. 2 and 3. The court fully and fairly instructed the jury, and we do not think he committed any error in giving or refusing to give instructions.

We think the record conclusively shows that appellant is guilty of stealing the cattle and that no prejudicial error is shown anywhere in the record.

The judgment is affirmed.