# PAYNE *v.* ARKANSAS.

No. 99. Argued March 3, 1958.—Decided May 19, 1958.

*Wiley A. Branton* argued the cause and filed a brief for petitioner.

*Thorp Thomas,* Assistant Attorney General of Arkansas, argued the cause for respondent. With him on the brief was *Bruce Bennett,* Attorney General.

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

Petitioner, a 19-year-old Negro, was convicted by a jury in Jefferson County, Arkansas, of first degree murder and sentenced to death by electrocution. On appeal to the Supreme Court of Arkansas he pressed two main contentions: (1) that the trial court erred in overruling his motion to suppress, and in receiving in evidence over his objection, a coerced and false confession, and that the error takes and deprives him of his life without due process of law in violation of the Fourteenth Amendment of the Constitution, and (2) that the trial court erred in overruling his motion to quash the panel of petit jurors upon the ground that Negroes were systematically excluded, or their number limited, in the selection of the jury panel, and that the error deprives him of the equal protection of the laws and of due process of law, in violation of the Fourteenth Amendment of the Constitution. The court held that these contentions were without merit and affirmed the judgment. 226 Ark. 910, 295 S. W. 2d 312. He then applied to us for a writ of certiorari, based on these contentions, which we granted because the constitutional questions presented appeared to be substantial. 353 U. S. 929.

We will first consider petitioner's contention that the confession was coerced, and that its admission in evidence over his objection denied him due process of law, in violation of the Fourteenth Amendment.

The use in a state criminal trial of a defendant's confession obtained by coercion—whether physical or mental— is forbidden by the Fourteenth Amendment.[1]  Enforce-

---

[1] See, e. g., Brown v. Mississippi, 297 U. S. 278; Chambers v. Florida, 309 U. S. 227; Lisenba v. California, 314 U. S. 219; Ashcraft v. Tennessee, 322 U. S. 143; Malinski v. New York, 324 U. S. 401; Haley v. Ohio, 332 U. S. 596; Watts v. Indiana, 338 U. S. 49; Stroble v. California, 343 U. S. 181; Leyra v. Denno, 347 U. S. 556;

ment of the criminal laws of the States rests principally with the state courts, and generally their findings of fact, fairly made upon substantial and conflicting testimony as to the circumstances producing the contested confession—as distinguished from inadequately supported findings or conclusions drawn from uncontroverted happenings—are not this Court's concern;[2] yet where the claim is that the prisoner's confession is the product of coercion we are bound to make our own examination of the record to determine whether the claim is meritorious. "The performance of this duty cannot be foreclosed by the finding of a court, or the verdict of a jury, or both."[3] The question for our decision then is whether the confession was coerced. That question can be answered only by reviewing the circumstances under which the confession was made. We therefore proceed to examine those circumstances as shown by this record.

Near 6:30 p. m. on October 4, 1955, J. M. Robertson, an elderly retail lumber dealer in the City of Pine Bluff, Arkansas, was found in his office dead or dying from crushing blows inflicted upon his head. More than $450 was missing from the cash drawer. Petitioner, a 19-year-old Negro with a fifth-grade education,[4] who had been employed by Robertson for several weeks, was suspected

---

*Fikes* v. *Alabama,* 352 U. S. 191. These cases illustrate the settled view of this Court that the admission in evidence over objection of a coerced confession vitiates a judgment of conviction.

[2] *Watts* v. *Indiana, supra,* at 50–53. Cf. *Ashcraft* v. *Tennessee, supra,* at 153; *Malinski* v. *New York, supra,* at 404; *Haley* v. *Ohio, supra,* at 598; and *Leyra* v. *Denno, supra,* at 558.

[3] *Lisenba* v. *California, supra,* at 237–238. See also *Brown* v. *Mississippi, supra,* at 278; *Chambers* v. *Florida, supra,* at 228–229; *Haley* v. *Ohio, supra,* at 599; *Watts* v. *Indiana, supra,* at 50.

[4] Petitioner was mentally dull and "slow to learn" and was in the fifth grade when he became 15 years of age. Because of his age he was arbitrarily promoted to the seventh grade and soon thereafter quit school.

of the crime.   He was interrogated that night at his home by the police, but they did not then arrest him.   Near 11 a. m. the next day, October 5, he was arrested without a warrant and placed in a cell on the first floor of the city jail.   Arkansas statutes provide that an arrest may be made without a warant when an officer "has reasonable grounds for believing that the person arrested has committed a felony," [5] and that when an arrest is made without a warrant the person arrested "shall be forthwith carried before the most convenient magistrate of the county in which the arrest is made," [6] and when the person arrested is brought before such magistrate it is the latter's duty to "state the charge [against the accused and to] inquire . . . whether he desires the aid of counsel [and to allow him] a reasonable opportunity" to obtain counsel.[7]   It is admitted that petitioner, though arrested without a warrant, was never taken before a magistrate, and that the statutes mentioned were not complied with.

Petitioner was held incommunicado without any charge against him from the time of his arrest at 11 a. m. on October 5 until after his confession on the afternoon of October 7, without counsel, advisor or friend being permitted to see him.   Members of his family who sought to see him were turned away, because the police did not "make it a practice of letting anyone talk to [prisoners] while they are being questioned."   Two of petitioner's brothers and three of his nephews were, to his knowledge, brought by the police to the city jail and questioned during the evening of petitioner's arrest, and one of his brothers was arrested and held in jail overnight.   Petitioner asked permission to make a telephone call but his request was denied.

---

[5] Ark Stat., 1947, § 43–403.

[6] Ark. Stat., 1947, § 43–601.

[7] Ark. Stat., 1947, § 43–605.

Petitioner was not given lunch after being lodged in the city jail on October 5, and missed the evening meal on that day because he was then being questioned in the office of the chief of police. Near 6:30 the next morning, October 6, he was taken by the police, without breakfast, and also without shoes or socks,[8] on a trip to Little Rock, a distance of about 45 miles, for further questioning and a lie detector test, arriving there about 7:30 a. m. He was not given breakfast in that city, but was turned over to the state police who gave him a lie detector test and questioned him for an extended time not shown in the record. At about 1 p. m. that day he was given shoes and also two sandwiches—the first food he had received in more than 25 hours. He was returned to the city jail in Pine Bluff at about 6:30 that evening—too late for the evening meal—and placed in a cell on the second floor. The next morning, October 7, he was given breakfast—which, except for the two sandwiches he had been given at Little Rock at 1 p. m. the day before, was the only food he had received in more than 40 hours.

We come now to an even more vital matter. Petitioner testified,[9] concerning the conduct that immediately induced his confession, as follows: "I was locked up upstairs and Chief Norman Young came up [about 1 p. m. on October 7] and he told me that I had not told him all of the story—he said that there was 30 or 40 people outside that wanted to get to me, and he said if I would come in and tell him the truth that he would probably keep them from coming in." When again asked what the chief of police had said to him on that occasion petitioner testified: "Chief Norman Young said thirty or forty people

---

[8] His shoes and socks had been taken from him for laboratory examination of suspected bloodstains.

[9] Petitioner took the stand both on the hearing of the motion to suppress the confession, which was held in chambers outside the presence of the jury, and upon the trial before the jury.

were outside wanting to get in to me and he asked me if I wanted to make a confession he would try to keep them out." The chief of police, on cross-examination, admitted that he had made the substance of that statement to petitioner,[10] and had told him that he would be permitted to confess to the chief "in private." In this setting, petitioner immediately agreed to make a statement to the chief. The chief then took petitioner to his private office, and almost immediately after arriving at that place there was a knock on the door. The chief opened the door and stepped outside, leaving the door ajar, and petitioner heard him say " 'He is fixing to confess now,' and he would like to have me alone." Petitioner did not know what persons or how many were outside the door. The chief re-entered his office and began questioning petitioner who orally confessed that he had committed the crime. Thereupon Sergeant Halsell of the State Police and Sheriff Norton were admitted to the room, and under questioning by Sergeant Halsell petitioner gave more details concerning the crime. Soon afterward a court reporter was called in and several businessmen were also admitted to the

---

[10] The chief of police testified:

"Q. When did the defendant first tell you he was going to confess? A. Approximately 1:00 P. M. on the afternoon of the 7th.

"Q. Now where were you at the time? A. At the time that he told me he was ready to confess he was in the jail in an upstairs cell and I was standing outside of the cell talking to him.

"Q. Were any other officers present? A. There was not.

"Q. State whether or not anything was said to the defendant to the effect that there would be 30 or 40 people there in a few minutes that wanted to get him? A. I told him that would be possible there would be that many—it was possible there could be that many.

"Q. Did you promise the defendant that he would have an opportunity to confess in private? A. I did.

"Q. Did you then go down to your office? A. We did."

room. Sergeant Halsell then requestioned petitioner and the questions and answers were taken by the reporter in shorthand. After being transcribed by the reporter, the typed transcription was returned to the room about 3 p. m. and was read and signed by petitioner and witnessed by the officers and businessmen referred to. Thus the "confession" was obtained.

At the beginning of the trial petitioner's counsel moved to suppress the confession because obtained by coercion culminating in a threat of mob violence. Following Arkansas procedure (*McClellan* v. *State,* 203 Ark. 386, 156 S. W. 2d 800), a hearing upon that motion was held before the trial judge in chambers, at which the facts above recited were shown without dispute. In addition petitioner testified that the confession did not contain the truth, and when asked why he made it, he answered: "Well, as a matter of fact lawyer Branton I was more than afraid because Chief Norman Young had already told me that there was 30 or 40 peoples outside and the way he stated it, if I hadn't, if I didn't make the confession that he would let them in, from the conversation, from the way that he told me." The trial judge overruled the motion to suppress the confession. The same evidence was then repeated before the jury, and the confession was admitted in evidence over petitioner's objection. The court instructed the jury to disregard the confession if they found it was not voluntarily made. The jury returned a general verdict finding petitioner guilty of first degree murder as charged and assessed the penalty of death by electrocution. Judgment accordingly was entered on the verdict.

That petitioner was not physically tortured affords no answer to the question whether the confession was coerced, for "[t]here is torture of mind as well as body; the will is as much affected by fear as by force. . . . A

confession by which life becomes forfeit must be the expression of free choice." *Watts* v. *Indiana,* 338 U. S. 49, 52, 53.[11] The undisputed evidence in this case shows that petitioner, a mentally dull 19-year-old youth, (1) was arrested without a warrant, (2) was denied a hearing before a magistrate at which he would have been advised of his right to remain silent and of his right to counsel, as required by Arkansas statutes, (3) was not advised of his right to remain silent or of his right to counsel, (4) was held incommunicado for three days, without counsel, advisor or friend, and though members of his family tried to see him they were turned away, and he was refused permission to make even one telephone call, (5) was denied food for long periods, and, finally, (6) was told by the chief of police "that there would be 30 or 40 people there in a few minutes that wanted to get him," which statement created such fear in petitioner as immediately produced the "confession." It seems obvious from the *totality* of this course of conduct,[12] and particularly the culminating threat of mob violence, that the confession was coerced and did not constitute an "expression of free choice," [13] and that its use before the jury, over petitioner's objection, deprived him of "that fundamental fairness essential to the very concept of justice," [14] and, hence, denied him due process of law, guaranteed by the Fourteenth Amendment.

Respondent suggests that, apart from the confession, there was adequate evidence before the jury to sustain the

---

[11] The cases of *Chambers* v. *Florida, supra,* at 240; *Lisenba* v. *California, supra,* at 237, 240; *Haley* v. *Ohio, supra,* at 600; *Ashcraft* v. *Tennessee, supra,* at 154; and *Ward* v. *Texas,* 316 U. S. 547, 555, all announce the same principle.

[12] See *Fikes* v. *Alabama, supra,* at 197.

[13] *Watts* v. *Indiana, supra,* at 53.

[14] *Lisenba* v. *California, supra,* at 236; *Lyons* v. *Oklahoma,* 322 U. S. 596, 605.

verdict. But where, as here, a coerced confession constitutes a part of the evidence before the jury and a general verdict is returned, no one can say what credit and weight the jury gave to the confession. And in these circumstances this Court has uniformly held that even though there may have been sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment.[15]

The admitted facts, set out above, make applicable the conclusion reached in *Chambers* v. *Florida*, 309 U. S. 227, 241: "Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death." The judgment must be reversed because of the admission in evidence of the coerced confession. It is therefore unnecessary at this time for us to discuss or decide the other question presented by petitioner—whether the overruling of his motion to quash the panel of petit jurors upon the ground that Negroes were systematically excluded, or their number limited, in the selection of the jury panel denied him the equal protection of the laws under the

---

[15] *Watts* v. *Indiana*, *supra*, at 50; *Malinski* v. *New York*, *supra*, at 404; *Lyons* v. *Oklahoma*, *supra*, at 597. *Stein* v. *New York*, 346 U. S. 156, is not to the contrary, for in that case this Court did not find that the confession was coerced. Indeed it was there recognized that when "the ruling admitting the confession is found on review to be erroneous, the conviction, at least normally, should fall with the confession. . . . [R]eliance on a coerced confession vitiates a conviction because such a confession combines the persuasiveness of apparent conclusiveness with what judicial experience shows to be illusory and deceptive evidence. A forced confession is a false foundation for any conviction . . . ." *Id.*, at 191–192.

Fourteenth Amendment—for we will not assume that the same issue will be present upon a new trial.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE HARLAN, concurring.

I join in the reversal of the judgment in this case because the Police Chief's testimony, quoted in footnote 10 of the Court's opinion, seems to me to require acceptance of petitioner's claim that his confession was induced through fear of mob violence.

MR. JUSTICE BURTON, on this record, would accept the conclusion of the state court and jury that petitioner's confession was voluntary. Therefore, he would affirm the judgment rendered. See his dissent in *Moore* v. *Michigan,* 355 U. S. 155, 165.

MR. JUSTICE CLARK, dissenting.

I believe that on this record the state courts properly held petitioner's confession voluntary. Moreover, even if the confession be deemed coerced, there is sufficient other evidence of guilt to sustain the conviction on the authority of *Stein* v. *New York,* 346 U. S. 156, 188–194 (1953). Just five years ago this Court established in *Stein* that there was no constitutional error "if the jury admitted and relied on the confession," or "rejected it and convicted on other evidence." 346 U. S., at 193–194. For purpose of making the latter determination, this Court assumed there that the confession was found coerced by the jury. It makes no difference that the determination of coercion here is by this Court rather than by the jury, for as is evident from the majority

opinion, the inquiry is the same—whether the confession was coerced. I must apply the *Stein* rule here because the Arkansas procedure on admission of challenged confessions is identical to that which we approved in that case. See *Nolan* v. *State,* 205 Ark. 103, 104, 167 S. W. 2d 503–504; *Dinwiddie* v. *State,* 202 Ark. 562, 570, 151 S. W. 2d 93, 95–96.