George JONES M–2329, Appellant,

v.

Charles ZIMMERMAN, Appellee.

No. 85–3637.

United States Court of Appeals, Third Circuit.

Argued Oct. 1, 1986.

Decided Nov. 28, 1986.

John T. Bender (argued), Pittsburgh, Pa., for appellant.

Kenneth J. Benson (argued), Asst. Dist. Atty., Pittsburgh, Pa., for appellee.

Before WEIS, MANSMANN, and HUNTER, Circuit Judges.

### OPINION OF THE COURT

WEIS, Circuit Judge.

In this habeas corpus case, petitioner alleges that the state trial court was required to rule specifically on the voluntariness of an inculpatory statement even though he denied making it. He also alleges a deprivation of the right to counsel of his choice because the prosecution demanded that the lawyer represent either petitioner or a co-defendant. We conclude that by denying suppression of the statement the state judge implicitly ruled it was voluntary, and similarly that failure to submit the issue to the jury was not constitutionally erroneous. We also find no violation of petitioner's right to counsel and will affirm the order of the district court denying the writ.

After a jury trial in the state court, petitioner Jones was convicted on several counts of robbery and other charges arising out of events that occurred in Pittsburgh, Pennsylvania, during the noon hour on January 6, 1977. The jury had ample evidence to find the following, almost uncontradicted, set of facts.

The petitioner and two companions, all armed with hand guns, appeared at an insurance company's office. Petitioner and one of his companions wore wigs and white

pancake makeup. The three men robbed the company of $3,030, and four employees of lesser sums.

Harvey Meieran, an occupant of an adjacent office, heard the disturbance and called the police. Seeing the three men leave the building, Meieran decided to follow them. He asked the driver of an approaching postal truck to block the getaway car. When the postal driver attempted to do so, the robbers fired several shots. One bullet lodged in the mail truck.

As the gunmen got into their auto, detectives in an unmarked police car pulled in front of it, and one of the robbers opened fire. All three then left their car, running down an embankment to the railroad tracks behind the insurance company building. Continuing along the tracks for a short distance, they climbed to adjoining Amberson Avenue, only a few hundred yards from the insurance office. Petitioner, still wearing a red wig and carrying a pistol, confronted Chris LaFollette, who was leaving his van to go into a nearby building. Jones commandeered the van and began to drive away with his two accomplices.

A police cruiser arrived and again shots were fired, this time police Sergeant Brown was wounded. As the robbers attempted to escape, they backed into a pole, damaging the van. More police officers converged on the scene, and the gunmen surrendered.

These events occurred within a few minutes; witness Meieran saw the entire incident, except for several seconds, from the time the robbers left the insurance company office.

When Jones was taken into custody he had white pancake makeup on his face. A red wig was found on the ground behind the wrecked van. As police led defendant to the patrol wagon, some money he had stuffed in his pockets during the robbery fell to the ground.

Shortly after the gunmen surrendered, Officer Stegena arrived and spoke to the wounded policeman. Stegena then assisted the other officers in searching Jones and started to pick up the money on the ground near defendant. Stegena testified: "some-body asked me how the police officer was, and I said, 'he got a hole about as big as half a dollar.' ... [Jones] said, 'I didn't mean to do it.' And he put his head down like in disgust." Stegena left the area in his police car. He did not accompany Jones in the patrol wagon.

The factual controversy here is what occurred while Jones was transported in the patrol wagon to the Public Safety Building in Pittsburgh. The police estimated that the trip took about ten minutes, and Jones' approximation was twenty minutes.

Three policemen rode with Jones in the back of the patrol wagon. The officers testified that at some point during the trip, Jones asked, "How is the policeman that got shot?" One of the officers advised Jones of his *Miranda* rights, and after Jones said he understood, the officer commented, "What the hell do you care?" According to the officer, Jones responded, "Because I'm the one that shot him. I don't want to see him die."

As part of the pre-trial procedures, Jones moved to suppress the officers' testimony about the inculpatory statement made in the patrol wagon. Jones denied making that statement during the trip, and testified the police beat and tortured him on the way to the Public Safety Building in an effort to have him confess to other unrelated crimes. After listening to extensive testimony, the hearing judge denied the motion to suppress.

During the trial, substantially the same testimony was produced. Jones had elected to act as his own counsel, although a lawyer from the Public Defender's office actively assisted him. In his closing argument, Jones began to discuss the incident in the patrol wagon. The district judge sustained an objection by the prosecutor and limited Jones' argument to credibility, disallowing references to coercion.

The jury found defendant guilty on three counts of robbery, two counts of recklessly endangering another person, one count of theft of movable property, one count of criminal conspiracy, and one count of aggravated assault, the last being the charge

arising out of the shooting of Sergeant Brown. The trial judge imposed consecutive terms of ten to twenty years on each of the three robbery counts for a total of thirty to sixty years. The sentences imposed on the remaining counts, including aggravated assault, were concurrent with the robbery terms.[1]

After direct appeals proved unsuccessful, Jones filed a state Post-Conviction Hearing Act petition. There he presented, among other issues, allegations that the suppression court had erred in declining to rule on the voluntariness of the patrol wagon statement, and that the trial court had erred in refusing to allow argument to the jury on the point. The Pennsylvania Supreme Court ultimately rejected Jones' position, concluding that because he had denied making the challenged statements, he could not raise an issue of voluntariness. *Commonwealth of Pennsylvania v. Jones*, 507 Pa. 580, 493 A.2d 662 (1985).[2] Jones then brought a federal habeas corpus action, which the district court denied.

Petitioner now appeals to this court, raising the admissibility of the statement as well as a claim that he was denied the opportunity to be represented by counsel of his choice.

## I.

■ The voluntariness issue here demonstrates the wisdom of the concurrent sentence doctrine. That canon may appropriately be applied when the alleged error is associated only with counts for which concurrent sentences are imposed and the other sentences are unassailable. In that circumstance, an appellate court may decline to review the challenged rulings. The theory is that because the defendant remains sentenced in any event, reviewing the concurrently sentenced counts is of no utility. The practice is eminently practical and conserves judicial resources for more pressing

needs. *See Barnes v. United States*, 412 U.S. 837, 848 n. 16, 93 S.Ct. 2357, 2364 n. 16, 37 L.Ed.2d 380 (1973); *United States v. Bey*, 736 F.2d 891, 893 (3d Cir.1984); *United States v. Grimes*, 641 F.2d 96, 97 n. 2 (3d Cir.1981); *United States v. Lampley*, 573 F.2d 783, 788 (3d Cir.1978). *Cf. Commonwealth v. Wolfe*, 220 Pa.Super. 415, 289 A.2d 153 (1972). The fact that a defendant may possibly suffer collateral consequences, such as impaired parole eligibility, has been cited as an objection to use of the practice. The record here contains no evidence of any such potential detriment to the petitioner.

It is helpful to put Jones' arguments in context. The voluntariness claim affects only the count of aggravated assault and one of the two counts of reckless endangerment. Although Jones asserts that he is entitled to a new trial on all charges, clearly the voluntariness issue has no bearing on the armed robbery convictions.

The challenged statement is related in no way to the events leading to those convictions and they would not be set aside even if the involuntariness claim were sustainable. The lack of relevance between the limited inculpatory statement and the robberies is easily seen.

Factors of time and space separated the day's events into two clearly distinguishable criminal episodes. The first offenses took place in the insurance office and the adjacent parking lots. After the robberies, when witness Meieran followed the fleeing gunmen in an attempt to secure the license number of the getaway car, they fired at him, the mail truck, and the detectives. No relationship with the robberies or the reckless endangerment count growing out of the confrontation in the parking lot appears in the inculpatory statement which referred only to the wounding of Sergeant Brown.

---

1. Sentences on the endangering counts were one to two years each. The theft sentence was three-and-a-half to seven years. The sentence on the aggravated assault charge was five to ten years to commence at the expiration of the theft sentence but concurrent with the robbery terms. The conspiracy sentence was ten to twenty years

to commence at the end of the assault term but concurrent with the robbery sentences.

2. Other published opinions on the case may be found at 289 Pa.Super. 556, 429 A.2d 59 (1980), and 324 Pa.Super. 359, 471 A.2d 879 (1984).

The second episode began on Amberson Avenue when Jones and his companions hijacked the van, only to be blocked by a police cruiser. The shots fired from the van threatened injury not only to Sergeant Brown but other policemen and civilians in the area. Although he had prudently taken cover under an automobile nearby, LaFollette, the dispossessed owner of the van, was also endangered by the shots. Thus, even if Jones had not shot Sergeant Brown, ample support existed for the second endangerment count.

The evidence of Jones' guilt on the robbery convictions is not only overwhelming—it approaches the incontrovertible. Numerous witnesses, whose credibility has not been questioned, confirmed beyond any doubt his activities from his entry into the insurance company office until his apprehension a few minutes later.

Jones testified that he did not commit the robberies. His story was that he happened to be in the Amberson area to visit his younger brother who lived in the neighborhood. Among other things, Jones did not explain the unusual fact that he had makeup on his face when arrested, nor did he even attempt to account for his presence with the other two robbers in the stolen van. Jones' defense is unbelievable and indeed, in light of all the evidence, is ludicrous.

Jones will remain sentenced for thirty to sixty years on the robbery convictions no matter what the outcome of the assault count; therefore, this case could be resolved under the concurrent sentence doctrine. Nevertheless, the record of the numerous post-conviction procedures persuades us that a dispositive review now may prove more economical in the long run.

## II.

The overwhelming evidence of guilt suggests that we consider whether the doctrine of harmless error applies. In addition to the evidence noted above, the record contained additional support for the guilty verdicts on the assault and second endangerment counts.

A ballistics expert testified that the bullet which struck Sergeant Brown was fired from a .357 caliber Smith & Wesson revolver. That gun which had spent shells in it was taken from the van after Jones and his two companions were captured. Other weapons and spent cartridges also were found in the van.

Testimony established that Jones had brandished a revolver during the robberies and when the van was stolen. A most reasonable inference is that he had fired the weapon during one or both of the two exchanges of gunfire. In any event, as an accomplice he was responsible for the criminal actions of his two associates.

In addition, Sergeant Brown, who was near the van when he was wounded, testified that Jones fired the gun. Moreover, Officer Stegena testified that when Jones heard the extent of Sergeant Brown's injury, he said, "I didn't mean it." In the circumstances, that spontaneous exclamation could be construed as an admission. We note that Jones does not allege this remark, which occurred before he left Amberson Avenue, was coerced.

The statement made in the patrol wagon, therefore, was purely cumulative. It was nothing more than additional evidence that Jones pulled the trigger, a fact that was not crucial to his culpability because the trial judge properly charged the jury it could find Jones liable as an accomplice in any event.

In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court ended speculation that constitutional error would always require reversal, notwithstanding the insignificant nature of the ruling at trial. "We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id.* at 22, 87 S.Ct. at 827.

The Court followed that path in *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and in *Milton*

*v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). In the latter case, the Court found that the admission of a confession given to a policeman posing as a fellow jail inmate was harmless error. The Court concluded that the jury had been presented with overwhelming evidence of the defendant's guilt, including other unchallenged confessions, and that the error "was, beyond reasonable doubt, harmless." 407 U.S. at 378, 92 S.Ct. at 2178.

*Chapman,* however, did not completely abrogate the per se reversibility of some constitutional errors. Despite the holding in *Milton v. Wainwright,* the Court repeated *Chapman's* exception for coerced confessions in *Rose v. Clark,* —— U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). "Despite the strong interests that support the harmless-error doctrine, the Court in *Chapman* recognized that some constitutional errors require reversal without regard to the evidence in a particular case. 386 U.S. at 23 n. 8, citing *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (introduction of coerced confession) ... This limitation recognizes that some errors necessarily render a trial fundamentally unfair." *Id.* at ——, 106 S.Ct. at 3106.

The record in the case at hand presents circumstances where we can confidently say that the alleged involuntary, inculpatory statement had no effect on the convictions for assault and reckless endangerment. Were it not for the Supreme Court's per se exception, we would invoke the harmless error rule. Because the Court has given no indication that it intends to modify the *Chapman* limitation, however, we are confined by it and therefore move to the merits of Jones' claims. *Cf.* Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale,* 125 U.Pa.L.Rev. 15, 31–32 (1976).

### III.

■ Jones contends that the state judge did not rule on the voluntariness issue at the pre-trial suppression hearing and compounded the error by refusing to submit the question to the jury. He argues to us that the trial judge apparently believed that because Jones denied making the inculpatory statement, he was in effect estopped from asserting alternatively that it was coerced.

Jones relies on *Lee v. Mississippi,* 332 U.S. 742, 68 S.Ct. 300, 92 L.Ed. 330 (1948). In that case, the prosecution had introduced an oral confession made by the defendant to two policemen. The defendant, however, denied that he had confessed and testified that several hours before his conversation with the officers, two detectives had threatened him. The prosecution did not counter the allegation of threats. The state supreme court held that because the defendant had denied making a confession, allowing him to argue on appeal that the statement had been coerced would be inconsistent. *Lee v. State,* 201 Miss. 423, 30 So.2d 74, 75 (1947). In effect, the court considered the defendant estopped.

The United States Supreme Court emphasized that the confession was a crucial element in the conviction and construed the guilty verdict as a jury finding that the statement had been given. Reasoning that a conviction could not be permitted to rest on a coerced confession, the Court concluded that the judgment was no less void because the defendant at one point said he had not made the statement. The case was remanded for further proceedings. 332 U.S. at 745, 68 S.Ct. at 301.

Although less than clear, the Supreme Court's opinion may be best understood by differentiating between the trial and appellate stages in the state courts. The Supreme Court apparently was impressed by the Mississippi court's comment that "[i]f the accused had not denied having made any confession at all, we would feel constrained to reverse the conviction ... because" the threats were undisputed. 30 So.2d at 75. The Supreme Court, assuming that coercion had led to a confession crucial to the prosecution's case, held that the state appellate court should not invoke an estoppel to prevent vacation of an improper conviction. 332 U.S. at 744, 68 S.Ct. at 301.

Just how that rationale would apply in the trial setting is not clear because no jury

finding would yet have been reached establishing that the confession had in fact been made. Yet in a pre-trial suppression hearing, perhaps a trial judge might not be free from the necessity of making a ruling on voluntariness simply because the defendant denies giving a confession. *See Boles v. Stevenson,* 379 U.S. 43, 85 S.Ct. 174, 13 L.Ed.2d 109 (1964).

Although the confession in *Lee* was the sine qua non of the conviction, and by contrast was an insignificant factor in the case at hand, we will assume nonetheless for this discussion that the *Chapman* per se rule is applicable.

Resolution of the voluntariness issue requires us to review procedural aspects of this case. Jones and a codefendant, Rodney Jackson, filed motions to suppress various items of evidence, including inculpatory statements. Jackson also participated in the suppression proceedings and denied giving a confession to the police after arriving at the Public Safety Building. Jackson alleged that he too had been beaten by the police.

As noted earlier, after several days of hearings the judge denied Jones' motion to suppress the statement. Because of the state's unfortunate practice of not transcribing attorneys' arguments, the record of the suppression hearing does not provide the details of the arguments advanced on the admissibility of Jones' statement. The hearing judge did not make detailed findings of fact on the record but stated that as to Jones, "whether or not statements were involuntary as a matter of law, and that is the standard at this time, according to the government's evidence the statement by George Jones within the [police] van was an inculpatory statement which was blurted out. On the other hand, he denies that the statement was made and further contends that he was tortured. However, that is a question of fact for the jury to decide."

The judge then discussed the confession that Jackson had denied making. "With regard to Rodney Jackson's statement at the police headquarters which began approximately 2:30 p.m. . . . . Mr. Jackson advanced the defense to that statement, that

again the Court cannot hold that the statement was involuntary as a matter of law, and that will be also a question of fact for the jury to decide."

In context, therefore, it is clear enough that the trial judge believed that he could not rule that the Jones statement was involuntary "as a matter of law." In other words, he could not remove it from the jury's consideration under Pennsylvania law. In so ruling, however, the judge necessarily was finding as a fact that the statement was voluntary and would be admitted into evidence at the trial for the jury's scrutiny. Had the judge accepted Jones' contention that the statement had been coerced, it would be inadmissible and would have been suppressed pretrial.

That Jones understood the ruling's effect is supported by the record. A few moments after the ruling, in discussing trial preparation with the judge, Jones said, "One, I wanted my wife to testify [at trial about his alleged injuries] since you didn't suppress none of the statements—right?"

The absence of specific factual findings by the trial judge at the conclusion of the suppression hearing does not require that an additional hearing be held at this time. As the Supreme Court said in *Townsend v. Sain,* 372 U.S. 293, 314, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), when the defendant's contention is considered during a suppression hearing, "it will usually be proper to assume that the claim was rejected on the merits." If the state court "after a full hearing reliably found the relevant facts," *id.* at 313, 83 S.Ct. at 757, a federal evidentiary hearing is not needed. The federal courts may "properly assume that the state trier of fact applied correct standards of federal law to the facts," in the absence of evidence giving reason to suspect that an incorrect standard was applied. *Id.* at 315, 83 S.Ct. at 758.

As an example, the Court cited circumstances similar to those here. If the defendant alleges *third degree* methods were used to obtain a confession, "and the state court refused to exclude the confession from evidence, the district judge may assume that the state trier found the facts

against petitioner, the law being, of course, that third degree methods necessarily produce a coerced confession." *Id. See also Woody v. United States,* 379 F.2d 130 (D.C. Cir.1967). *Cf. United States v. Powe,* 591 F.2d 833 (D.C.Cir.1978).

In the case at hand substantial evidence was introduced at the suppression hearing to contradict Jones' assertion that he had been beaten and tortured. In addition to police denials, the testimony of paramedics and a nurse negated Jones allegations that he had visible wounds from mistreatment.

We conclude, therefore, that no additional hearing on voluntariness is required. The denial of Jones' motion to suppress—after a full and complete pre-trial hearing—properly set the stage for the admission of his inculpatory statement into evidence at the trial.

### IV.

Jones further contends that the trial judge erred in refusing to allow argument on voluntariness or to submit the issue to the jury. Preliminarily, we seriously question whether Jones properly preserved the alleged deficiency in the charge for appeal. Neither he nor his lawyer requested an instruction on this issue, nor did they suggest the addition of appropriate language at the conclusion of the charge to the jury.

During Jones' summation to the jury, the prosecutor interrupted. Because the summations were not transcribed, the record contains only the prosecution's objection, "I think this is misleading the jury seeing we did have a suppression on this, and the [c]ourt ruled it was not coerced." Jones responded, "I don't believe the [c]ourt ruled that the statement was not coerced." The trial judge stated, that "[t]he question is simply whether you made the statement or not. . . . You are entitled to argue credibility as I have told you several times, but the question of whether or not the statement was coerced is not a question for the jury."

Although in his post-trial motions Jones raised a general question of voluntariness, apparently it referred to the *Miranda* warning. The state trial court rejected that contention in an opinion denying a new trial.

Pennsylvania allows a defendant to argue the voluntariness of a confession to a jury although the trial judge had previously ruled the evidence to be admissible. *See Commonwealth v. Cunningham,* 471 Pa. 577, 370 A.2d 1172 (1977). In this habeas corpus proceeding, however, we apply federal constitutional standards. If they have been met, we will not pass on complaints of error resting on lack of compliance with state procedural requirements.

In *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972), the Supreme Court held that if a judge has admitted a confession into evidence, the Constitution does not require submission of the voluntariness issue to a jury as well. A state may adopt a double submission process if it chooses, but failure to do so does not amount to a federal constitutional deprivation.

The trial judge in this case did submit to the jury whether Jones had in fact made the inculpatory remark. Even if we assume *arguendo* that the issue of voluntariness should have been given to the jury under Pennsylvania law, Jones is not entitled to relief because he has not established a federal constitutional infringement.

Moreover, because the hearing judge had ruled the inculpatory statement to be admissible, the *Chapman* per se exception does not apply. We conclude that the failure to submit voluntariness to the jury, even if constitutional error, was harmless in light of the record in this case.

### V.

Jones also contends that he was unconstitutionally denied the right to counsel of his choice. Attorney Paul Gettleman initially represented both Jones and his companion, Rodney Jackson. The prosecution asserted that this dual representation presented a conflict of interest, and the court instructed Gettleman to select one of the two defendants as his client. He decided to represent Jackson.

The trial was set for May 25, 1977. Jones asked for a continuance, and the

motion was granted. Although Jones had decided to represent himself, a member of the Public Defender's staff acted as his legal advisor. On August 6, 1977, Jackson escaped from custody and was at large during Jones' trial.

After Jackson had escaped, Jones did not ask the court until October 11, the morning scheduled for jury selection, if he could be represented by Gettleman. Jones announced Gettleman would act as his attorney; however, the trial judge disagreed, stating that Gettleman had come to chambers that same morning and stated that "he did not want—that was his term—to represent George Jones." Later Gettleman again appeared in chambers, and on the record detailed his trial commitments for the following weeks. He stated that if the trial were continued until he was available, he would be willing to represent Jones.

The court refused to delay the trial, considering the large number of witnesses waiting to testify. After ascertaining that Jones had been a defendant in two previous trials and had two years of college studies in prison, the trial judge directed the public defender to continue advising Jones.

In similar situations, we decided that a defendant does not have an absolute right to be represented by counsel of his choosing. Thus, in *United States ex rel. Carey v. Rundle*, 409 F.2d 1210, 1214 (3d Cir. 1969), *cert. denied*, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970), the determination was made to proceed with appointed advisory counsel when the lawyer of choice was not available. There we held that the denial of a continuance did not amount to a constitutional deprivation.

As we have previously explained, the defendant's right to choose his own counsel must be balanced with the "state's legitimate interest in regulating the professional conduct of attorneys appearing in its courts and in ensuring the proper administration of justice." *Davis v. Stamler*, 650 F.2d 477, 480 (3d Cir.1981). *See also Siers v. Ryan*, 773 F.2d 37 (3d Cir.1985).

We find that the trial judge properly exercised his discretion to proceed with the trial. We note particularly the failure of defendant to take any action between the date of Jackson's escape and the day of trial. Furthermore, even in that situation we cannot say that the conflict of interest barrier had been removed. The trial judge had ample reason to believe that Jones' belated motion to continue the trial until Gettleman would become available was "part of an ongoing shell game with the court." We thus find no merit to Jones' contention that his right to counsel was violated.

The judgment of the district court will be affirmed.