Wilbert A. WEEKLEY and Edward J. Mayerhofer, Defendants Below, Appellants,

v.

The STATE of Delaware, Appellee.

Thomas H. WINSETT, Defendant Below, Appellant,

v.

The STATE of Delaware, Appellee.

Supreme Court of Delaware.

Sept. 6, 1966.

See also Del.Super., 205 A.2d 510.

H. James Conaway, Jr., of Young, Conaway, Stargatt & Taylor, Wilmington, for Thomas H. Winsett.

C. Waggaman Berl, Jr., of Berl, Potter & Anderson, Wilmington, for Wilbert A. Weekley.

Arthur J. Sullivan, of Morris, James, Hitchens & Williams, Wilmington, for Edward J. Mayerhofer.

F. L. Peter Stone and Michael N. Castle, Deputy Attys. Gen., for the State.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

CAREY, Justice.

These appeals attack sentences imposed by the Superior Court after verdicts of guilty by a jury. Appellant Winsett was found guilty of murder in the first degree, with a recommendation of mercy; appellants Weekley and Mayerhofer were found guilty as accomplices. They seek reversals with instructions to direct the entry of judgments of acquittal or, in the alternative, to grant new trials. Their charges of error may be thus summarized: (1) the Court below erred in denying motions challenging the array of the Grand Jury and requesting a voir dire examination of the panel members; (2) the Court erred in denying postponement of trial requested because of the existence of prejudice caused by widespread publicity; (3) the Court erred in admitting into evidence defendants' oral and written statements; (4) as to Weekley and Mayerhofer, the Court erred in denying motions for acquittal; (5) as to Winsett, the Court erred in denying an application for separate trial; (6) as to Winsett, the verdict was based upon insufficient evidence.

The evidence presented by the State, including statements given to the police by defendants, justified a finding of the following facts: The victim was a State Trooper who, in company with a fellow officer, had gone to a motel on Route 13 near Wilmington in response to a complaint received in the early morning hours of October 17, 1963. His death was the result of a shot fired by Winsett.

The three defendants had come to Delaware from New York the evening before for the purpose of stealing television sets from motels. Winsett arrived first in a Pontiac car; the others came later in a Cadillac. They registered at several motels. During the night they took some television sets from one or more motels, putting them in the Cadillac. They left that car parked at a diner, and went in the Pontiac to the motel where Winsett had taken a room. There they stole three sets, placing them in the rear of the car. Winsett then got into the middle of the front seat and Mayerhofer into the driver's seat. Weekley was about to get into the right side when he saw the officer coming and yelled "Here comes someone." The officer called to them to stop, that he was a State Policeman, and pulled out his pistol while walking or running toward the car. Winsett pulled a shot gun from under the front seat and fired at the officer, who then fired several times. One bullet "creased" Weekley's forehead. Winsett again fired and the officer fell to the ground, mortally wounded. The defendants then drove away. The car itself had been hit by the officer's bullets, and defendants soon abandoned it not far from the motel, and ran off into an undeveloped woody area between Route 13 and the Delaware River where they remained for about thirty-six hours until apprehended. Twice during this period Mayerhofer alone went to a nearby diner and brought back sandwiches and drinks. On his second visit he saw the headlines of a newspaper showing photographs of the other two defendants and stating that a

manhunt was on for them as suspects in the killing.

Apprehension of the defendants occurred on October 18 about 5:30 P. M. They were first found by three police officers, who were quickly joined by several others. They were told to lie down on their stomachs. Two of them complied, but Winsett lay on his back. An officer told him to turn over on his stomach and either nudged or kicked him with his foot, depending on whose testimony is believed. The defendants were then searched and handcuffed, then escorted to separate police cars.

On the way to one of the cars, an officer asked Winsett who had shot the deceased; he identified himself as the shooter but indicated that he did not know the victim was an officer at that time since the latter was not in uniform. In the car in which Winsett was riding, some questions were asked him concerning weapons and Winsett stated that he had hidden two pistols near the point of apprehension. He agreed to help the officers to find them. He also said that the shot gun had been thrown out of the car along the road before the car was abandoned. A shot gun was later found in that area. After he had agreed to help to find the pistols, the officers took him back to a place near the scene of apprehension where two pistols were found. The party then proceeded to the nearby police station.

Weekley rode to the same station with two officers. On the way, he named Winsett as the person who shot the officer and related certain other things which he said occurred at the time of the shooting. Mayerhofer also made a similar statement to the two officers with whom he rode to the station.

At the police station, defendants were questioned and written statements taken, which will be discussed later herein. They were ultimately taken before a committing magistrate about 3:00 A.M. on October 19 and were held for trial.

I.

Defendants' first argument is that the Court erred in denying their application to question the members of the Grand Jury panel on voir dire and their challenge to the array of Grand Jurors. Their contentions are (a) that they were entitled to have the case passed upon by an unprejudiced and unbiased Grand Jury; (b) that, because of extensive publicity during the twenty-day period between arrest and indictment, an "impartial Grand Jury was impossible"; (c) that in any event they should have been granted a voir dire to determine whether the jurors were prejudiced, whether they were legally qualified to serve, and whether they had been drawn in compliance with our statutes governing selection of Grand Jurors. The Court below (State v. Winsett, Del.Super., 200 A.2d 692) held that bias or prejudice of a member of the Grand Jury is not ground for challenge, because that jury is an accusatory and not a judicial body which in fact had the right and duty to act upon its own information, however acquired. The members are sworn to present no person for envy, hatred or malice, to leave no person unpresented because of fear, favor, affection, reward or hope of reward, and "to present all things truly as they come to your knowledge."

The cases cited by defendants are not in point. Some of them deal with challenges of petit jurors; others deal with challenges to the array of Grand Jurors because of a failure to follow constitutional or statutory requirements designed to prevent discrimination in the selection of Grand Jurors. None of them holds that bias or prejudice is a ground for challenge. On the other hand, many cases hold that challenge may not be made on this ground in the absence of constitutional or statutory provision. 4 Anderson's Wharton Crim.Law and Proc. 434; United States v. Knowles, D.C., 147 F.Supp. 19.

Challenges of Grand Jurors in this State are governed by Superior Court Criminal Rule 6, Del.C.Ann., which is very similar

to the Federal rule bearing the same number. The array may be challenged on the ground that the panel was not selected, drawn or summoned in accordance with law; individual members may be challenged on the ground that they are not legally qualified. The only statutory qualification is that the juror be qualified to vote at the general election. 10 Del.C. § 4504.

In this case, defendants made no specific allegation either that the panel was improperly selected or summoned, or that any member was unqualified. Apparently they believed that some defect might be discovered through a voir dire. We are not aware of any instance in this State of the use of voir dire as to a Grand Jury; none appears in our reports. In Brown v. Commonwealth, 76 Pa. 319, the Court denied the existence of such a procedure, and pointed out that, if it were followed by every person indicted, the criminal courts could not carry out their business. In United States v. Knowles, supra, which arose after the adoption of the present Federal rules, it was held that no voir dire examinations exist in respect to Grand Jurors, and that their status may not be questioned except for lack of legal requirements. This case was cited and quoted with approval in Estes v. United States, 5 Cir., 335 F.2d 609, cert. den. 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559. We think these holdings are sound and accept them as the law of this State.

We find no error in the ruling of the Court below on this point.

## II.

Defendants next complain of the refusal to grant a postponement of the trial. The killing occurred on October 17 and the indictments were returned on November 6, 1963. Defendants were arraigned and pleaded not guilty on November 22. The next term of Superior Court commenced early in December. These cases were continued to the March Term because of pending motions. In March they were continued to the June Term. On May 19, the Court informed counsel that trial would commence on June 8. On the morning of the trial date, defendants requested a further continuance which was denied. The trial thus commenced about seven months after defendants were indicted. The argument made here is that, because of great adverse newspaper and radio publicity, defendants could not obtain a fair and impartial petit jury at that time, and that further delay in starting the trial would have given the effect of this publicity an opportunity to abate, thereby improving the prospect of obtaining an unbiased jury. We make no comment upon the lateness of the motion, which was first made just as the Court was about to start impaneling the jury.

Most of the publicity occurred directly after the crime took place. From time to time thereafter, as various preliminary matters were heard by the Court, additional publicity appeared. In both extent and content, however, it by no means reached the heights described in Irvin v. Dowd, 81 S.Ct. 1639, 366 U.S. 717, 6 L.Ed.2d 751, or Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, and other cases cited by defendants. The trial Judge necessarily has a wide discretion in determining whether the impact of publicity prevents fair trial at a given time and we should not disturb his ruling unless an abuse of discretion is shown.

In an effort to show such an abuse, defendants now point to the number of persons who conceded on voir dire that they had read and heard the newspaper and radio accounts and had formed or expressed an opinion. In his opinion denying a new trial, Del.Super., 205 A.2d 510, the trial Judge summarized the statistics concerning the jurors examined. Out of 102 jurors questioned for the "regular" panel, 29 were excused for cause, which we will assume means that they had formed an opinion; out of 22 questioned for "alternates", 10 were excused for cause. All others excused were either peremptorily challenged

or excused because of conscientious scruples or medical reasons. The percentage excused for cause was not so large as to justify a finding that an unbiased jury could not possibly be obtained. Moreover, the Judge stated his recollection, which is not questioned here, that "no juror was seated whom defendants, or any of them, challenged for any reason".

We cannot hold on the information before us that the Judge abused his discretion in refusing the continuance.

## III.

Prior to trial, motions were made by all defendants to suppress the oral and written statements given by them to the police. Lengthly hearings took place at which defendants testified. The ultimate outcome was that the Court admitted into evidence those statements made by defendants from the time of their apprehension about 5:30 P.M. until the time they were completed about 9:30 P.M., but rejected all statements given thereafter. The Court reaffirmed this ruling in deciding defendants' post-trial motions. See Del.Super., 205 A.2d 510. Defendants now charge error in this ruling.

Some additional facts must here be stated. After arrival at the police station following their apprehension, the defendants were taken to separate rooms. Each was asked to remove most or all of his clothing which was examined by the police. Certain scratches and marks on their bodies were noted and a record thereof made. An officer saw the wound or gash over Weekley's eye and called in a physician who gave him a tetanus injection. The doctor testified that Weekley was fatigued but otherwise alright. Winsett and Weekley put their clothes back on promptly, but for some reason Mayerhofer was given back only his pants and underpants until over an hour later. Upon his complaint of feeling cold, however, the rest of his clothing was returned at once.

One or two officers remained with each defendant in the various rooms. Conversations took place during which all of them freely answered questions about the crime. According to the police, after Winsett had put his clothes back on, he was told that he did not have to make any statement, oral or written, if he did not wish to do so, and that he had a right to obtain an attorney if he wished. He answered that he did not need one and that he might as well "come clean". An oral interview then took place after which a typewritten statement in question and answer form was prepared and was signed by him. During this period he was given hot food and drink, as well as cigarettes. At the commencement of the typing, he was told of the language therein to the effect that he was making it of his own free will without threat or promises, knowing that it could be used against him.

After Weekley had received the tetanus shot, he was questioned by the police who typed the questions and answers. The questioning was interrupted at some stage while he ate a meal brought in by an officer. At other times he was given cigarettes and soft drinks. When completed, the statement was read to him and he initialed all but the last page. He refused to sign it, however, saying he would like to see a lawyer first. He was asked if he knew any lawyers here and said he did not. He asked for a public defender, but was told that there were no public defenders in Delaware.* He then asked to see a State's Attorney, whereupon a Deputy Attorney General was called in. It was explained to him by both the policeman and the attorney that the latter was "on the other side". He nevertheless inquired of the attorney whether he should sign the statement and was allegedly told that "if it is the truth, go ahead and sign it, it won't hurt you". He still refused to sign, stating that he would rather talk to his own attorney. A few minutes later, however, when a slight error was discovered in the state-

---

* The Delaware public defender system was inaugurated in 1964. See 29 Del.C., Ch. 26.

ment, another page containing a correction of that error was typed and he did sign that page.

Mayerhofer was questioned orally, following which his statement in the form of questions and answers was typed. Before the typing began, he was told that he did not have to make a statement and, if he did, it could be used against him. Neither he nor the police said anything about an attorney. The typing was interrupted while he ate a full meal. He was given cigarettes and soft drinks. He signed the statement.

■ All of the foregoing matters, of course, took place before defendants had the benefit of counsel. Trial of the case commenced on June 8, 1964, prior to the decision in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. Neither that decision nor Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, control the present case. Brown v. State, Del., 221 A.2d 609, and Parson v. State, Del., 222 A.2d 326. The question before us is whether the statements were made voluntarily; if they were, failure to provide counsel or to inform defendants of their right to remain silent does not require a reversal.

Defendants contend that the statements were involuntary. They point out that, at the time of their apprehension, they were cold, hungry, fatigued, excited and upset. This is doubtless true, but there was ample justification for the Judge to believe that their condition was not brought about by any wrongful act of the police, and that the statements were voluntary nevertheless.

■ Several things must be kept in mind. In the first place, defendants were not immature or totally ignorant of police procedures; two of them had previously been involved with the police, at night, in a police station, and the third held a private detective's license in New York. In the second place, the trial Judge was not duty bound to believe defendants' testimony as against that of the officers, or even to accept at face value their uncontradicted testimony concerning their feelings and emotions or their alleged reasons for cooperating with the officers. He saw the witnesses on the stand and was therefore better able to evaluate their testimony than are we. Likewise, we cannot hold unwarranted his finding that certain alleged physical abuse at the scene of apprehension and at the entrance of the station was in fact insignificant, even if intentional. Finally, there was no questioning over a period of many hours, no trickery, no promises, no deprivation of food, no coercion or duress. The police simply asked questions which the defendants answered.

■■ Defendants also point to the failure to take them before a committing magistrate until about 3 A.M., but as we pointed out in Webster v. State, Del., 213 A.2d 298, in determining the reasonableness of such delay, the significant hours of detention are those occurring before the confession and not those thereafter. This case more nearly resembles the Webster case, supra, than Vorhauer v. State, Del., 212 A.2d 886, where the confession was not obtained until more than twenty-four hours after the arrest and before any preliminary hearing. Under all of the circumstances, we cannot say that there was an unreasonable delay in taking the defendants before a committing magistrate.

■ Of course, the Court's ruling on admissibility did not foreclose defendants from raising the question of voluntariness before the jury. Wilson v. State, 10 Terry 37, 109 A.2d 381; Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. It was in fact raised at trial, although defendants did not take the stand. The Court stated the applicable law in its charge.

■ We find no reversible error in the ruling upon admissibility.

## IV.

Defendants Weekley and Mayerhofer contend that the evidence did not justify a finding that they aided or abetted Winsett in committing the homicide and that their conviction under our accomplice statute (11 Del.C. § 102) cannot be upheld. They argue that the agreement among the three was merely to steal television sets, which would constitute larceny or burglary, that there was no common intent to kill, and that homicide is not to be reasonably anticipated during the commission of that intended crime as contrasted with robbery or other crimes of violence.

This argument arises because of the trial Judge's reliance upon State v. Norris, 6 Terry 267, 71 A.2d 755, in which this was said:

> "The rule seems well settled that all persons who join together with a common intent and purpose to commit an unlawful act which, in itself, makes it not improbable that a crime not specifically agreed upon in advance might be committed, are responsible equally as principals for the commission of such an incidental or consequential crime whenever the second crime is one in futherance of or in aid to the originally contemplated unlawful act. Wharton's Criminal Law, 12th Ed., Vol. 1, Sec. 258; Commonwealth v. Doris, 287 Pa. 547, 135 A. 313; People v. Sink, 374 Ill. 480, 30 N.E.2d 40; Cyc. Criminal Law, Vol. 1, Sec. 259".

■ Weekley's statement indicates that, although he knew Winsett had a pistol with him, he did not know the shot gun was in the car and that, when the officer came running towards him, he told Winsett not to shoot and kicked or shoved the shot gun. Mayerhofer's statement also indicates that he did not know of the presence of the shot gun but did know that Winsett had some pistols with him. Obviously, especially in the light of testimony of one witness that both Weekley and Mayerhofer had pistols in their belts a little earlier in the evening, there was ample evidence to justify the jury in finding that defendants were prepared to shoot, if necessary to carry out their purpose, and that a shooting was not improbable. The demands of the holding in State v. Morris, supra, are fully met and no further comment is needed. We think there was ample evidence to justify their conviction as accomplices to the homicide.

## V.

■ Defendant Winsett moved, prior to trial, for a severance which was denied. He now charges that he did not receive a fair trial because of that denial. He contends that he was harmed in several ways. One is that defendants were limited to a total of twenty peremptory challenges of jurors, with the result that Winsett was forced to compromise with the views of the other defendants as to which jurors should be seated. Rule 24(b) limits peremptory challenges to twenty for joint defendants in capital cases, but it also gives the Court power to allow joint defendants additional challenges and to permit them to be exercised separately or jointly. Winsett does not argue that he specifically requested or was denied relief under the latter proviso. Some indulgence was granted, for the record shows that the defendants actually exercised twenty-five peremptory challenges against those persons drawn for the regular panel. In any event, nothing in the briefs convinces us that any actual harm was suffered by Winsett on this score.

■ Another suggestion of harm is that Winsett was deprived of control over the "way the evidence went in". This suggestion must apply to that which was put in by defendants because certainly they had little or no control over the order in which the State put in its evidence. The fact is, however, that the evidence put in by defendants was comparatively meager, and a reading of it leaves us at a total loss to understand how Winsett could have con-

ceivably been harmed by the "way it went in"; indeed, most of it was introduced through his own counsel.

We think the only argument of any importance under this heading is that Winsett's statement disagreed in some respects with those of his co-defendants and that, although the jury was carefully told more than once that any statement was evidence only against the one who made it, the jury nevertheless could not be expected to keep such a distinction in mind and probably considered all statements against him. We can understand how this could occur in a given case and how it could be of such significance as to warrant this court in holding the denial of a severance to be an abuse of discretion. Burton v. State, 1 Storey 546, 149 A.2d 337. In the present instance, however, we fail to understand how Winsett suffered any harm, because we find no differences of any great significance in the three statements as to the homicide itself; the chief area of disagreement pertains to events which occurred after the killing. Winsett never denied the plan to steal the television sets. Little disagreement existed as to its execution. His chief defense was based upon that part of his statement in which he charged that the officer was the first to shoot, and that he simply fired his shot gun to make the unknown person stop firing. The statements of the co-defendants do not dispute that contention; the important conflicting testimony came from two employees of the motel, both of whom testified to hearing the first blast of the shot gun before the pistol shots were fired.

We find no reversible error in the refusal of a separate trial.

## VI.

Winsett's final argument is that the circumstantial evidence did not justify his conviction. This would be material only if we were to hold his statement inadmissible. Having held that it was admissible, we need not consider this point.

The judgment below will be affirmed as to all defendants.