**STATE of Delaware, Plaintiff Below, Appellant,**

v.

**Michael A. OAKES, Defendant Below, Appellee.**

Supreme Court of Delaware.

Submitted Jan. 10, 1977.

Decided April 19, 1977.

Edward C. Pankowski, Jr., Deputy Atty. Gen., Wilmington, for plaintiff below, appellant.

Thomas Herlihy, III, of Herlihy & Herlihy, Wilmington, for defendant below, appellee.

Before HERRMANN, C. J., DUFFY and McNEILLY, JJ.

McNEILLY, Justice:

Defendant appeals from his conviction by a Superior Court jury of rape in the first degree, 11 *Del.C.* § 764,[1] kidnapping in the second degree, 11 *Del.C.* § 783,[2] and two counts of possession of a deadly weapon during commission of a felony, 11 *Del.C.* § 1447.[3] The State appeals from the Trial Court's dismissal of the original charge of kidnapping in the first degree, 11 *Del.C.* § 783A.[4] We affirm defendant's conviction and agree with the State as to the resolution of its appeal.

I.

On March 5, 1975, the victim was confronted by a knife-wielding assailant in the parking lot of a shopping center, ordered into the passenger seat of her car, and driven to a secluded area behind the shopping center. The assailant raped the victim at knife-point; apart from the rape, no other physical violence occurred. Afterwards, the assailant left the scene, and the victim returned to the home of her parents, where she resided. Extremely shaken, she related what had happened to her parents, who called the police. The police interviewed the victim and she was then taken to a hospital, where an examination confirmed that intercourse had taken place.

The victim identified the defendant as her assailant from photographs, and on the

1. 11 *Del.C.* § 764 provides:
   "A male is guilty of rape in the first degree when he intentionally engages in sexual intercourse with a female without her consent, and
   "(1) In the course of the offense he inflicts serious physical, mental or emotional injury upon the victim, or
   "(2) The victim was not the defendant's voluntary social companion on the occasion of the crime and had not previously permitted him sexual contact."
   "Rape in the first degree is a class A felony."

2. 11 *Del.C.* § 783 provides:
   "A person is guilty of kidnapping in the second degree when he unlawfully restrains another person with any of the following purposes:
   "(1) To hold him for ransom or reward; or
   "(2) To use him as a shield or hostage; or
   "(3) To facilitate the commission of any felony or flight thereafter; or
   "(4) To inflict physical injury upon him, or to violate or abuse him sexually; or
   "(5) To terrorize him or a third person; and the actor voluntarily releases the victim alive, unharmed, and in a safe place prior to trial."
   "Kidnapping in the second degree is a class B felony."

3. 11 *Del.C.* § 1447 provides in pertinent part:
   "(a) A person who in possession of a deadly weapon during the commission of a felony is guilty of possession of a deadly weapon during commission of a felony."

4. 11 *Del.C.* § 783A provides:
   "A person is guilty of kidnapping in the first degree when he unlawfully restrains another person with any of the following purposes:
   "(1) To hold him for ransom or reward; or
   "(2) To use him as a shield or hostage; or
   "(3) To facilitate the commission of any felony or flight thereafter; or
   "(4) To inflict physical injury upon him, or to violate or abuse him sexually; or
   "(5) To terrorize him or a third person; and the actor does not voluntarily release the victim alive, unharmed, and in a safe place prior to trial."
   "Kidnapping in the first degree is a class A felony."

evening of March 6, 1975, two policemen, Detectives Dillon and Wilkinson, went to the home of defendant's parents, where defendant lived, with valid arrest and search warrants. Defendant, a ninth grade dropout, was then at night school (DECA). The detectives explained the charges to defendant's parents, searched defendant's room pursuant to the warrant, and were given permission by defendant's father to search defendant's automobile, registered in the parents' names, upon defendant's return from school.

When defendant returned home, about 10:20 p.m., the detectives identified themselves as policemen to defendant, informed defendant of the charges against him, read defendant his *Miranda*[5] rights from a card, which defendant said he understood, and placed defendant under arrest. A search of defendant's automobile resulted in the seizure of two knives, one from the glove compartment and one from a fishing box in the trunk.

Defendant was permitted to call his DECA teacher, Mr. Larry Lawson, whose wife was given directions to the police station (Troop 2) to which defendant was to be taken. The police took defendant to Troop 2, arriving about 10:50 p.m., and defendant's parents and Mr. Lawson arrived soon thereafter. Defendant was taken to an interrogation room, where Detective Wilkinson once again gave the *Miranda* warnings, which defendant indicated he understood. About 11:15 p.m. defendant admitted the charges, the questioning continuing until about 2:00 a.m. for the purpose of obtaining recorded and written statements.

## II.

■ Defendant first contends that the Trial Court erred in admitting his recorded and written statements into evidence for consideration by the jury because they were involuntary and made in violation of his *Miranda* rights.

Defendant asserts that the requirements for a voluntary statement set forth in *State*

*v. Winsett,* Del.Super., 238 A.2d 821, aff'd, Del.Supr., 251 A.2d 199 (1968), were not met:

> "The judgment must be based on the 'totality of the circumstances.' *Blackburn v. State of Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). Factors which bear on these circumstances include the following: defendant's age and mental condition (whether he was 'dull,' for example), whether he was denied a hearing before a magistrate, whether he was advised of his right to remain silent or his right to counsel, whether he was held incommunicado and if so how long, whether he was denied food for long periods, whether there were any threats of mob violence, the legality of his arrest, *Payne v. State of Arkansas,* supra, [356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975]; defendant's educational background and experience, his emotional stability or lack thereof, his record as to former crimes, whether the police used subterfuge in obtaining the statement, whether the statement was composed by a police officer, whether defendant had the aid of counsel or relatives or friends, whether there was prolonged police questioning of defendant. *Ann.:* Admissibility of Confession, 4 L.Ed.2d 1833." 238 A.2d at 824–25. (Footnote omitted)

### A.

Defendant contends that age and size differences and the posture assumed by the interrogating officer contributed to the creation of a coercive atmosphere. Defendant was nineteen years old at the time of his arrest, five feet six inches tall, and weighed one hundred thirty-five pounds, while his primary interrogator, Detective Wilkinson, was thirty-three years of age and weighed one hundred eighty-three pounds. During the questioning, defendant asserts, Detective Wilkinson was seated on a desk, "menacingly" overlooking him. We find nothing unusual or coercive in such an age and weight disparity; the relative physical statures are not, in fact, overly disparate and

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

are beyond the control of all parties concerned. Nor do we find the posture assumed by the interrogating officer coercive.

## B.

Defendant contends that his mental capability also affected the voluntariness of his confession. It is undisputed that defendant was "dull," having a fourth or fifth grade reading level, a ninth grade education, and having failed the Armed Forces Qualification Test. At least two considerations weigh against concluding that defendant's mental capacity hampered him in his dealings with the police. Mr. Yoselowitz, who was the recruiter defendant contacted when trying to join the armed services, testified that defendant did not have trouble conversing, nor did he express difficulty in understanding the spoken word, although he did have some trouble with the written word. Also, defendant had recently faced an indecent exposure charge in the Court of Common Pleas, during which he discharged the Public Defender representing him. These factors indicate defendant had a clear understanding of what was happening to him and his constitutional rights involving counsel. Limited mental capacity is but one factor to consider in determining the voluntariness of a confession, *Mealey v. State,* Del.Supr., 347 A.2d 651 (1975), and

we find defendant's contention on this point unpersuasive.

## C.

Defendant next makes an argument at variance with his assertion that he did not understand his constitutional rights and their significance; that he specifically requested an attorney while being questioned at Troop 2, and told the police that he could not afford one and did not know if his parents could provide him with one. The record shows, however, that Detective Wilkinson, the primary interrogating officer, testified that no such request was made.[6]

The admission of the statements into evidence constitutes a finding by the Trial Court that no request for counsel was made, and this finding will not be disturbed, as it is supported by sufficient evidence.

## D.

The next contention made is that the length of the interrogation, from sometime after 10:30 p.m. until 2:00 am. the following morning, coupled with the denial of an opportunity by defendant to see his parents or teacher during this period, rendered the statements involuntary. We do not find the length of the questioning excessive, and also note that defendant first confessed

---

6. *Deputy Attorney General:*
"What did you tell him?"
*Detective Wilkinson:*
"That he had the right to an attorney; if he couldn't afford an attorney the State would provide one for him; he doesn't have to say anything, that if he did say anything it could be used against him in a court of law; that if he did decide to answer my questions he could stop me at any time that he wished, stop answering any time that he wished."
*Deputy Attorney General:*
"Did you read those rights from a card?"
*Detective Wilkinson:*
"No."
(Note: The first time the rights were given, they were read from a card.)
*Deputy Attorney General:*
"Did the Defendant express that he understood his rights?"
*Detective Wilkinson:*
"I asked him if he understood, and he said, 'Yes.'"

*Deputy Attorney General:*
"Is that before the taped interview?"
*Detective Wilkinson:*
"Yes."
*Deputy Attorney General:*
"Did Michael Oakes, while the tape was being heard and conducted, did he ever attempt to stop that recording?"
*Detective Wilkinson:*
"No."
*Deputy Attorney General:*
"Did he ever ask you to stop questioning him?"
*Detective Wilkinson:*
"No."
*Deputy Attorney General:*
"Did he ever express that he wanted an attorney present?"
*Detective Wilkinson:*
"No, never."

about 11:15 p.m., approximately forty-five minutes after his arrest. Once again, the testimony conflicted on the question of whether defendant requested to see his parents or teacher, and we find the conclusion of the Trial Court supported by sufficient evidence.

Other factors are asserted by defendant as bearing on the voluntariness of his statement, including not having eaten all day, subterfuge used by police, and the supplying by police of certain facts contained in the statements. Defendant voluntarily chose not to eat and did not request food while at Troop 2; in fact, he refused the offer of coffee and cigarettes. The Trial Court did not find use of subterfuge nor the supplying of facts by police, and the record supports this conclusion.

Therefore, we conclude that defendant's statements were made voluntarily and in accordance with the *Miranda* requirements, whether the surrounding circumstances are considered individually or as a totality.

### III.

Defendant next challenges his indictment in two respects.

He contends that the charge of first degree kidnapping was defective in that it lacked a statement of returning the victim to a safe place. The indictment reads:

"KIDNAPPING FIRST DEGREE, in violation of Title 11, Section 783A(4) of the Delaware Code of 1953, as amended."

"Michael Andrew Oakes on or about the 5th day of March, 1975, in the County of New Castle, State of Delaware, did then and there unlawfully restrain one _____ for the purpose of violating or abusing her sexually, and did not release her unharmed prior to trial."

This defect, argues defendant, left him unable to prepare properly for trial and insufficiently protected him against double jeopardy.

Count II of the indictment, defendant also argues, charging the offense of possession of a deadly weapon during commission of a felony, was defective in that it failed to state that the weapon was other than an ordinary pocketknife carried in a closed position.[7] The indictment reads:

"POSSESSION OF A DEADLY WEAPON DURING THE COMMISSION OF A FELONY, in violation of Title 11, Section 1447 of the Delaware Code of 1953, as amended."

"MICHAEL ANDREW OAKES on or about the 5th day of March, 1975, in the County of New Castle, State of Delaware, did then and there feloniously have in his possession a deadly weapon, to wit: a hunting knife, during the commission of a felony, to wit: Rape First Degree, by feloniously engaging in sexual intercourse with one _____, a female, without her consent, said _____ not being the defendant's voluntary social companion and not having previously permitted him sexual contact, in violation of 11 *Del.C.* § 764(2)."

The indictment gave defendant notice of the facts constituting the offenses charged and identified the sections of the criminal code under which he was charged. There is no requirement that an indictment follow the express language of the statute; it is sufficient if it contains a plain and definite statement of the essential facts constituting the offense charged. *Brown v. State,* Del.Supr., 239 A.2d 628, 629 (1968). Defendant made no allegation of resulting prejudice, and it is clear that none arose because of the sufficiency of the indictment, and with respect to the first degree kidnapping charge, because of its dismissal by the Trial Court. We find no merit to these contentions.

### IV.

Defendant's other contentions, that the instructions to the jury regarding second

---

**7.** *"Deadly* weapon" is defined in 11 *Del.C.* § 222(5), which provides:

"(5) 'Deadly weapon' includes . . . a knife of any sort (other than an ordinary pocketknife carried in a closed position) . . . ."

degree rape were confusing, and that jury instructions regarding police questioning of defendant were incomplete, are similarly without merit.

### V.

In its appeal, the State contends that the Trial Court erred in dismissing the charge of first degree kidnapping, because the victim was released "unharmed" within the meaning of the statute.[8] We believe that defendant's statement of the question reveals the weakness of that view: "The victim suffered no physical harm aside from the fact that there had been a rape." *Defendant's Opening Brief,* at 25.

There is no question but that rape involves serious physical and psychological consequences, perhaps greater than would be suffered as a result of a knife or gunshot wound. It would be contrary to the tenets of a civilized society to determine that rape is not harm. We therefore adopt the rule followed in California, that rape alone, without accompanying physical violence, constitutes harm to a kidnap victim. *People v. Chessman,* 38 Cal.2d 166, 238 P.2d 1001, 1013 (1951).

Affirmed. Statute construed.

---

8. The Trial Court determined that rape of itself is not "harm."